BROWN, C.J.
*1063 Defendant, Troy Donell Gaines, was convicted of manslaughter and sentenced to 40 years at hard labor. Defendant now appeals, arguing that his sentence is excessive. We affirm defendant's conviction and sentence.
FACTS
On December 6, 2011, Chandrikia "Drika" Green was found shot to death in the closet of the apartment she shared with her boyfriend, Troy Gaines. Drika, who was 21 years old, and defendant, who was 29 years old, had dated for around six years, had two children together, and lived in the Glenwood Townhomes in West Monroe, Louisiana. However, Drika and defendant had been having problems, and several weeks before her death, Drika had begun staying with her sister, Chandra Green, in the Westbrook Apartments, also in West Monroe.
Defendant suspected that Drika was cheating on him and that she wanted to leave him. Before her death, Drika had told several people that she was scared of defendant, who had destroyed their furniture by cutting holes in the couch and chair and breaking the mirror on the dresser. On December 5, 2011, Drika had gone to the apartment manager and inquired about changing the locks on the door. Because defendant was also on the lease, the manager called him to see if he would remove himself from the lease in order for Drika to have the locks changed, but he refused. According to the manager, Drika was visibly upset upon learning she couldn't have the locks changed.
On the evening of December 5, 2011, Drika and Chandra and their kids went to Drika's apartment for the kids to get a haircut. They then went back to Chandra's apartment. After Drika fed the kids and got them ready for bed, she drove Chandra's car back to her own apartment to get ready for work around 9:00 to 10:00 p.m. Drika had been working at Glenwood Hospital in the housekeeping department for about six months on the graveyard shift, which was 11:00 p.m. to 7:00 a.m. However, Drika never made it to work that night.
Defendant arrived in Tallulah, Louisiana, at the house of his uncle, Ernest Robinson, Sr., around 3:00 to 4:00 a.m. on December 6, 2011. Defendant was crying and "just wasn't himself." He had a gun and told his uncle that Drika was dead, but that "he couldn't catch the other guy." Robinson could not make sense of what his nephew was telling him, but he told defendant to put the gun down on a barstool, and he called defendant's father, Troy Donell Gaines, Sr., to let him know what was going on. Robinson then told defendant that he was calling the police, and defendant left. Robinson put the gun in a bag, called 911, told them his nephew was there with a gun saying that his "friend girl" was dead, and turned the gun over to the police when they got to his house.
Around 4:00 a.m., defendant called his sister, Kamonica Buckley, and told her to take care of his kids. When Kamonica asked defendant what he meant, defendant's response was that he told Drika if he caught her cheating, he would kill her. Kamonica, who also lived in Glenwood Townhomes with her husband Keyatta and their children, went to get Pam Brown, the apartment manager, to let her into defendant's apartment to check on Drika and the kids. When they went inside, Keyatta *1064 told her to stay downstairs but he was unable to see anything when he went upstairs to look because it was dark. The Buckleys and Ms. Brown left the building and walked outside; that's when the police and Gaines, Sr., arrived on the scene.
Gaines, Sr. had called the police earlier and told them that his son had shot his girlfriend in their apartment. The police initially searched the apartment, but could not find Drika. When the police asked Gaines, Sr., (who according to one witness was on the phone with defendant at the time) where Drika was, he told them to look in the closet. After officers moved two large dressers that were barricaded in front of the closet doors, Drika was found dead, slumped over in the corner of the closet. Drika had two gunshot wounds, one to the head and one to the chest. Ms. Buckley and her husband Keyatta went over to Chandra's house to tell her that Drika was dead. Defendant was arrested later that day in Tallulah.
Firearms testing confirmed that the bullets recovered from Drika's body were fired from the gun that defendant left at his uncle's house. The investigation revealed no evidence supporting defendant's statement to his uncle about another man in the apartment with Drika. Although Alonzo Green, a co-worker of the victim, admitted that he had been in a sexual relationship with Drika for approximately two months, he had not been at her apartment on the night of the shooting.
Defendant was charged by bill of indictment with second degree murder. Following a trial, on March 27, 2017, the jury found defendant guilty of the responsive verdict of manslaughter. On May 15, 2017, the sentencing hearing was held. Finding that the evidence presented at trial was sufficient to convict defendant of second degree murder rather than the lesser offense of manslaughter, the trial court imposed the maximum sentence of 40 years at hard labor.
Defendant filed a motion to reconsider sentence, arguing that the trial court failed to adequately consider the fact that he had acted under strong provocation, as shown by evidence that the victim was cheating on defendant, as a mitigating factor in sentencing. The trial court denied the motion without providing reasons. This appeal followed.[1]
DISCUSSION
Defense counsel contends that defendant's 40-year sentence is excessive, and that the trial court failed to consider any mitigating factors. Noting that the evidence suggested that the victim had sexual relations with at least one other person during her relationship with defendant, and that there were no facts presented which indicated exactly what happened before the victim was shot, defense counsel claims that there was sufficient evidence for the jury to believe that this incident was manslaughter, not murder. Defendant argues that although he was only convicted of manslaughter, the trial court's imposition of the maximum sentence for that offense was based on its belief that defendant should have been found guilty of second degree murder. Defendant points out that at the sentencing hearing, the trial court did not mention any factors contained in the pre-sentence investigation (PSI) report, such as defendant's social history, work experience, education, to what extent this sentence would entail a *1065 hardship upon defendant and his family, or any other information mitigating in defendant's favor.
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos , 419 So.2d 475 (La. 1982) ; State v. DeBerry , 50,501 (La. App. 2 Cir. 04/13/16), 194 So.3d 657, writ denied , 16-0959 (La. 05/01/17), 219 So.3d 332.
Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey , 623 So.2d 1276 (La. 1993) ; State v. Bonanno , 384 So.2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver , 01-0467 (La. 01/15/02), 805 So.2d 166 ; State v. DeBerry , supra .
The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Allen , 49,642 (La. App. 2 Cir. 02/26/15), 162 So.3d 519, writ denied , 15-0608 (La. 01/25/16), 184 So.3d 1289. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Allen , supra . On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Jackson , 48,534 (La. App. 2 Cir. 01/15/14), 130 So.3d 993.
As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. State v. Cozzetto , 07-2031 (La. 02/15/08), 974 So.2d 665 ; State v. Hogan , 47,993 (La. App. 2 Cir. 04/10/13), 113 So.3d 1195, writ denied , 13-0977 (La. 11/08/13), 125 So.3d 445.
In considering the nature of the offense, both the trial court and the reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged. State v. Lewis , 09-1404 (La. 10/22/10), 48 So.3d 1073. The fact that the evidence might have supported a verdict of second degree murder is an appropriate sentencing consideration in a case where the defendant has been convicted of the lesser offense of manslaughter. State v. White , 48,788 (La. App. 2 Cir. 02/26/14), 136 So.3d 280, writ denied , 14-0603 (La. 10/24/14), 151 So.3d 599 ; State v. Ross , 50,231 (La. App. 2 Cir. 11/18/15), 182 So.3d 1035.
The offense of manslaughter is punishable by imprisonment at hard labor for not more than 40 years. La. R.S. 14:31.
The trial court did not abuse its discretion in sentencing defendant to 40 years at hard labor. At the sentencing hearing, the trial court noted its review of the PSI report, defendant's criminal history, and defendant's statement expressing remorse.
*1066 The trial court then stated that defendant's sentence was primarily based on the facts presented at trial, including evidence regarding defendant's violent acts against the victim, and the nature of the offense. The trial court stated its belief that the evidence presented was sufficient to convict defendant of second degree murder, as there was no real evidence of provocation, and that defendant benefitted from the jury's decision to find him guilty of the lesser offense of manslaughter.
The PSI report provides additional information about defendant's criminal history and the increasing volatility of his relationship with the victim. At the time of the instant offense, defendant was on probation for a simple burglary conviction.[2] Also, on three occasions in 2011, the police were called to the Glenwood Townhomes in response to domestic disturbances between defendant and the victim. As a result of an incident on November 3, 2011, approximately one month before the murder, defendant was arrested for domestic abuse battery and ordered to have no contact with the victim. The reports include allegations that defendant struck the victim in the face, took her phone to prevent her from calling the police, chased her, destroyed property in their apartment, threatened her with a knife, and held a gun to her head. Further, there is information in the police report that before the shooting, defendant was likely stalking the victim by following her to her sister's house and work and watching her from an abandoned apartment in their complex. The victim's fears of defendant were real, and tragically, she was not able to get away from him before he ended her life.
The reasons stated by the trial court, the record, and the PSI report, taken together, provide a factual basis for the sentence imposed. Defendant shot his girlfriend, the mother of his two young children, in the head and in the chest, barricaded her in the closet, and left her to die. Despite evidence that the victim was having an affair, there was no justification provided for defendant's actions. The trial court properly concluded that defendant's conduct constituted second degree murder, and therefore, justified the imposition of the maximum sentence for manslaughter.
The imposed 40-year maximum sentence is not constitutionally excessive. Considering the heinous facts of this case and the benefit of the reduced sentence derived from the responsive verdict, the maximum sentence imposed by the trial court does not shock the sense of justice, nor is it grossly disproportionate to the severity of the offense. This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.

On June 6, 2017, the state filed a habitual offender bill charging defendant as a second-felony offender. The matter was set for a hearing on December 1, 2017, but there is no further information in the record. Any subsequent adjudication and sentence on the habitual offender bill is not before the Court in the current appeal.

Defendant also has a prior arrest from 1999, when he was 17 years old, for four counts of attempted first degree murder and aggravated arson. Although these charges were ultimately dismissed, defendant admitted to investigators that he set the fire at the house of a man who he thought was "always picking on him."